## BANFIELD *v.* PARKER.

Where the question before the jury is the good faith of a sale of goods, whatever is said in the progress of the negotiations, and contemporaneous with the sale, and having a tendency to give a character to it, and which derives credit from it, is admissible.

But a recital of past transactions is not admissible; and where the sale had been completed, and one of the parties, during the afternoon of the day of the sale, at another place, stated to other persons what had been done, — *Held*, that the statements were inadmissible.

TRESPASS.    The writ was dated June 30, 1855, and contained three counts.    The plaintiff relied at the trial upon the third count only, which charged that the defendant, on the 15th day of May, 1855, at Wolfborough, took and carried away the goods and chattels of the plaintiff from the plaintiff's store, there situated, and converted the same to the defendant's own use.    Value of goods alleged, $1,871.77.    Plea, the general issue, with a brief statement, setting forth that the goods referred to were, at the time of the taking, the property of one John W. Avery, and that the defendant, being a deputy of the sheriff of the county of Carroll, took said goods by attachment upon two writs which he then held against Avery ; one in favor of Wm. Pierce & Co. and the other in favor of Whitney, Fenno, Shaw & Co. ; that he proceeded under the statute to sell the goods upon said writs, and that he had applied a portion of the proceeds of the sale upon an execution which had been recovered in the action in favor of Pierce & Co. *v.* Avery, and that he retained the balance to be applied on such execution as might be recovered in the other action in favor of Whitney, Fenno, Shaw & Co.    The plaintiff introduced evidence tending to show that he bought the goods in controversy of Avery ; had taken the delivery of the same, and was in possession thereof on the 12th day of May, 1855, when the defendant took them, &c. ; that the negotiations between the plaintiff and Avery for the purchase of said goods commenced in Boston on the morning of the 8th of the same May ; that the parties arrived in Wolfborough at night of the same day, examined the goods, and closed the negotiations by an agreement that the plaintiff should take the goods upon certain conditions, and that an invoice was taken of the goods that evening and the next forenoon, and that the invoice was receipted and the payment for the goods made in the presence of two witnesses, about noon of the 9th of the same month, after which

the plaintiff and Avery started for Boston, where they arrived that night.

The defendant then introduced evidence tending to show that said John W. Avery was deeply involved in debt at the time of the alleged sale to the plaintiff; that Pierce & Co. and Whitney, Fenno, Shaw & Co. were creditors of Avery, and that said sale was made for the purpose and intent to delay, hinder and defraud Avery's creditors, and was therefore void as against this defendant and those for whom he acted.

To rebut this evidence the plaintiff introduced other evidence, tending to show what the negotiations were between Avery and the plaintiff, how they were introduced, and what was done by the parties in the course of the transactions, from the commencement of the negotiations to the close of the sale, for the purpose of satisfying the jury that there was no such fraudulent intent as the defendant alleged, or, at least, if there was any such intent on the part of Avery, the plaintiff had no knowledge of it, but that the plaintiff bought in good faith, intending to go into business himself at Wolfborough.

The plaintiff called Avery as a witness, who stated that the first talk about this trade was in Boston, in Mills & Forristall's store, (where the plaintiff was employed as clerk,) on the morning of May 8, 1855, to which place the witness had gone to pay some money on a debt he owed said firm; that he transacted his business, he and the plaintiff being then alone together. The witness then proceeded as follows : " Something was then said by me to Banfield about his feeble health. He said that his health was very feeble, and that it was killing him to stay there in that place, and he had got to change his business. I then said, ' You had better have bought me out,' and added, ' it is not too late now.' I told him it would be a good time then to buy me out, before I bought any more goods, as my stock was then low, and he could buy the Spring goods himself. We then had further talk about the trade, that I do not recollect. He said he did not know how he could trade then, as he did not know as he could get off from his employers

until his time was out, but concluded, if he could not get off then, he could get his brother to tend store for him until such time as he could get off, or his time expired. I made my proposals how I would sell to him," &c.

To the admission of this testimony the defendant objected, but the court admitted it.

Soon after the above conversation, it appeared that the plaintiff went to a lawyer, Mr. E. C. Banfield, to inquire how they should do the business, and Avery went with him. The plaintiff then called said E. C. Banfield as a witness, who testified that he was a practicing attorney in Boston, and that the plaintiff and Avery called upon him at his office in May, 1855. The witness proceeded as follows : " The plaintiff said he was then negotiating a trade with Avery for his whole stock of goods. He asked me what was necessary to make a good and proper sale, and if the business could all be done at my office. I stated to him in reply that a simple bill of sale would be all that was necessary, and that he had better go to Wolfborough himself, take an account of the stock, agree upon the price, and have the possession of the property given to him, and the payments made there, in the presence of some good and proper witnesses ; that this would be the most thorough and satisfactory way of doing the whole business.

" I then made some inquiries of Mr. Avery, such as I usually make. I asked him if there were any mortgages or incumbrances on this stock of goods. He said there were not. I asked him about his solvency, not knowing but there were some insolvent laws in New-Hampshire as there were in Massachusetts. He said he considered himself solvent, and that he considered that he had more than property enough to pay his debts. I then said to him, ' There is no intention of defrauding any creditors in this matter ?' He replied, ' Certainly not.' Banfield then made a similar inquiry of Avery, and said that if there was any intention of defrauding creditors he would have nothing to do about it. Avery assured him there was not, and they left the office."

To this testimony the defendant objected, but the court admitted it. The plaintiff also introduced one Richard R. Davis as a witness, who testified that he was one of the selectmen of Wolfborough in 1855, and that on the 9th day of May, 1855, soon after dinner, the plaintiff and Avery were riding past his house on the road from Wolfborough to Dover, and about one mile from South Wolfborough. They stopped, and the plaintiff came into his shop, and said that he had bought out John W. Avery, and intended to settle at South Wolfborough, as he owned a house there, and asked witness if he should be a legal voter there at the next election. Being informed that the statute required six months' residence, the plaintiff told witness to see that his name was on the check-list, as he wanted to vote there the next Spring, if he could, and said he should try and get there in season. To this testimony the defendant objected, but the court allowed it. To all which rulings of the court the defendant excepted.

The jury having returned a verdict for the plaintiff, the defendant moved to set the same aside and for a new trial, for supposed error in the rulings of the court.

*Wheeler*, with whom were *Rollins* and *Hill*, for the defendant, cited the following authorities: *Carter* v. *Gregory*, 8 Pick. 168; 1 Greenl. Ev., sec. 108; *Sessions* v. *Little*, 9 N. H. 271; *Plumer* v. *French*, 22 N. H. (2 Foster) 450; *Lund* v. *Tyngsborough*, 9 Cush. 36.

*Whipple* and *Emerson*, for the plaintiff.

EASTMAN, J. If the evidence which was excepted to was competent, it must be upon the ground that it was a part of the *res gestæ*. Upon other principles it could not be admitted against this defendant.

The principal issue to be tried was the good faith of the sale by Avery to Banfield, and whatever was said by the parties contemporaneous with the sale, and having a tendency to elucidate or

give a character to it, and which would derive credit from it, was admissible. *Sessions* v. *Little*, 9 N. H. 271 ; *Mahurin* v. *Bellows*, 14 N. H. 210 ; *Plumer* v. *French*, 22 N. H. (2 Foster) 450 ; *Hersom* v. *Henderson*, 23 N. H. (3 Foster) 498.

In *Newman* v. *Bean*, 21 N. H. (1 Foster) 93, it was held that the correspondence and negotiations which led to a contract were admissible, as showing that the contract itself was *bonâ fide*. But a recital of past transactions is not competent. This is clear. *Haynes* v. *Rutter*, 24 Pick. 242.

The negotiations for the goods in controversy commenced in Boston on the 8th day of May, and the parties at once left, and in the evening of that day arrived at Wolfborough, where the goods were. They then closed the bargain, and commenced taking an inventory of the goods the same evening. Now what was said between Banfield and Avery at the store in Boston, on that morning, in the progress of the negotiations and connected with them, was, under the rule, competent evidence, as tending to show the character of the sale. It was contemporaneous with the main fact — the good faith of the sale — and had a tendency to unfold the nature of the transaction and to derive credit from it. So also what was said at the attorney's office was admissible upon the same principles. *Johnson* v. *Elliott*, 26 N. H. (6 Foster) 67.

But the testimony of Davis as to what the plaintiff said after the sale and transfer of the goods, was incompetent. Davis had nothing to do with the sale or purchase of the goods. The negotiations had all been completed, the invoice of the goods taken, the payment of the money made, and Banfield had taken possession of the property. The business was all finished, and the statement of the plaintiff at that time that he had bought out Avery was in no way part of the *res gestæ*, nor contemporaneous with the sale, but a recital of past transactions, when the plaintiff was making inquiries as to other matters. For the admission of this evidence the verdict must be set aside and a

*New trial granted.*